UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-6954-GW-SKx | Date | September 10, 2020 |
|---|---|---|---|
| Title | *Plan Check Downtown III, LLC v. AmGuard Insurance Company, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kathryn L. Boyd<br>Janine F. Cohen | Chet A. Kronenberg |

**PROCEEDINGS:** TELEPHONIC HEARING ON DEFENDANT'S MOTION TO DISMISS [8]

The Court's Tentative Ruling is circulated and attached. Court and counsel confer. For reasons stated on the record, the Court continues the motion to September 17, 2020 at 8:30 a.m.

|  | : | 18 |
|---|---|---|
| Initials of Preparer | JG | |

<u>*Plan Check Downtown III v. AmGuard Insurance Company et al*</u>; Case No. 2:20-cv-06954-GW-(SKx)
Tentative Ruling on Defendant's Motion to Dismiss

### I. Background[1]

Like many other restaurateurs across the country, plaintiff Plan Check Downtown III has seen its business suffer greatly since the onset of the ongoing COVID-19 pandemic. In response to various city- and state-government orders requiring restaurants to suspend on-premise dining and individuals to shelter at home, Plan Check stopped all operations at its two restaurant locations in Los Angeles in March 2020. Compl. ¶ 43. While its West Los Angeles location has since reopened for take-out and delivery service, its downtown location remains closed. *Id.*

Prior to these events, Plan Check had purchased a property insurance policy from defendant AmGuard Insurance Company (the "Policy") for its two restaurants. *Id.* ¶ 14. The Policy provides coverage for, among other things, loss of business income due to the necessary suspension of business operations due to any "physical loss of or damage to" the covered properties. *See* Policy § I.A.5(f). Plan Check argues that its loss of business income caused by the changes to its operations is covered by the Policy and submitted a claim to AmGuard for reimbursement. Compl. ¶ 50. AmGuard rejected the claim, concluding that Plan Check had not suffered a physical loss or damage to its properties and that in any event a "virus exclusion" in the Policy meant that Plan Check's claims were not covered. *Id.* ¶ 52.

After AmGuard's denied its claim, Plan Check brought this putative class action against AmGuard on behalf of all restaurants in California that purchased comprehensive business insurance coverage from AmGuard. *Id.* ¶ 64. Plan Check filed its lawsuit in California state court, alleging a breach of contract and other related claims. AmGuard removed the case to federal court based on diversity jurisdiction. *See* NoR at 2-5. Before the Court is AmGuard's motion to dismiss for failure to state a claim.

### II. Legal Standard

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure

---

[1] The following abbreviations are used for the filings: (1) Notice of Removal ("NoR"), ECF No. 1; (2) Complaint ("Compl."), ECF No. 1-1; (3) Business Owner's Coverage Form ("Policy"), ECF No. 10-1; (4) Defendant's Motion to Dismiss ("Mot."), ECF No. 8; (5) Plaintiff's Opposition to Motion to Dismiss ("Opp."), ECF No. 17; (6) Defendant's Reply in Support of Motion to Dismiss ("Reply"), ECF No. 21.

to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

The court must construe the complaint in the light most favorable to the plaintiff, by accepting all well-pled allegations of material fact as being true, and drawing all reasonable inferences from well-pleaded factual allegations in favor of the plaintiff. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion, the plaintiff must provide grounds demonstrating its entitlement to relief. *Twombly*, 550 U.S. at 555 (2007). Under the Supreme Court's decisions in *Twombly* and *Iqbal*, this requires that the complaint contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### III. Discussion

The parties agree that the Policy is governed by California law. *See generally Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal.App.4th 637, 718-21 (1993) (principal location of insured risk is most important consideration in determining which state's law applies to insurance policy); Restatement (Second) of Conflict of Laws § 193 (rights created by policy are determined by the local law of the state which the parties understood was to be the principal location of the insured risk).

"When determining whether a particular policy provides a potential for coverage," a court "[is] guided by the principle that interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18 (1995). "[A]ny ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates." *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 807 (1982). The purpose is "to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy." *Id.* at 808. "Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured, exclusionary clauses are interpreted narrowly against the insurer." *Id.*

A. The terms of the insurance policy

In the Policy, AmGuard promises that "[it] will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Policy § I.A. It goes on to provide a subsection titled "Additional Coverages," which specifies some covered causes of loss. Relevant here, that section includes:

> **Section I – Property**
>> A. Coverage
>>> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>>> * * *
>>> 5. Additional Coverages
>>>> f. Business Income
>>>>> . . . We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.
>>>>> * * *
>>>> g. Extra Expense
>>>>> (1) We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. . . .
>>>>> (2) Extra Expense means expense incurred:
>>>>> (a) To avoid or minimize the suspension of business and to continue "operations":
>>>>> (i) At the described premises; or (ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.
>>>>> (b) To minimize the suspension of business if you cannot continue "operations" . . . .

Policy § I.A.5.f-g. The Policy includes an "Exclusions" section. Relevant here is the following "virus exclusion":

> **Section I – Property**
>> A. Coverage
>>> * * *
>> B. Exclusions
>>> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>>>> a. Ordinance Or Law
>>>> * * *
>>>> j. Virus or Bacteria.
>>>>> (1) Any virus, bacterium or other microorganism that induces or is capable of

inducing physical distress, illness or disease.

Policy § I.B.1.j(1).

    B. Whether Plan Check suffered from any "direct physical loss of or damage to" its properties

The Policy is an "all-risk property" insurance policy[2] that limits its coverage to "direct physical loss of or damage to Covered Property." Policy § I.A.[3] The term "physical loss or damage" is typically the trigger for coverage in modern all-risk property insurance policies. 10A Couch on Insurance (3d ed. 2010), § 148:46. The word "physical" modifies both "loss" and "damage." Plan Check concedes that its properties did not suffer any "physical damage." Opp. at 11. However, the parties do dispute whether Plan Check has suffered a "physical loss."

Neither the words "physical" nor "loss" are defined in the Policy. When interpreting an insurance policy provision, courts "must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Palmer v. Truck Ins. Exch.*, 21 Cal.4th 1109, 1115 (1999). Courts must also "interpret these terms in context, and give effect to every part of the policy with each clause helping to interpret the other." *Id.*

AmGuard focuses on the word "physical." That the "loss" must be "physical," given the ordinary definition of that word, "is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, *physical alteration of the property*." *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal.App.4th, 766, 799 (2010) (emphasis added) (quoting Couch on Insurance, § 148.46). According to AmGuard, the fact that there was no physical alteration to the properties means that Plan Check has not suffered a physical loss of property.

Plan Check, on the other hand, focuses on the word "loss" and the accompanying prepositions. In particular, it emphasizes the fact that the Policy extends to "physical *loss of* property" or "physical *damage to* property." Plan Check's main criticism of AmGuard's

---

[2] An "all-risk" policy is one that covers all losses of the type described unless the loss is specifically excluded. By contrast, a named-perils policy covers only losses attributable to expressly enumerated causes.

[3] The Policy covers physical loss of or damage to Covered Property "caused by or result from any Covered Cause of Loss." Policy § I.A. The Covered Causes of Loss in turn are defined broadly to include all "[r]isks of direct physical loss" unless the loss falls within one of the Policy's exclusions or limitations.

4

interpretation that "loss of" requires some kind of physical alteration is that it would make the terms "loss of" and "damage to" redundant. According to Plan Check, the Policy must be read so that these two terms have different meanings. Opp. at 14; *see also Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 753 (1993) ("The way we define words should not produce redundancy, but instead should give each word significance.").

Plan Check's interpretation of "physical loss of" would not require a tangible alteration to the property, but would "include[] changes in what activities can physically occur in the space that cause loss to the insured, without including changes to the property that have no physical manifestation." Opp. at 14. This would be a major expansion of insurance coverage, but by limiting the requirement of a tangible alteration to "physical damage to," Plan Check argues this better harmonizes the case law while giving effect to these two terms. Under this interpretation, its inability to offer on-premise dining at its restaurants would be a physical loss of property covered by the Policy, even though there was no physical alteration.

While Plan Check's argument is not inconceivable, the Court finds that it places too much weight on the need to avoid surplusage, and asks a handful of words – "loss," "of," and "to" – to do too much work. The Court is mindful of the principle that in interpreting insurance policies, a court should "give effect to every part of the policy with each clause helping to interpret the other." *Palmer*, 21 Cal.4th at 1115. However, this is not an inflexible rule that a court must follow when the outcome would be impracticable. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Flintkote Co. v. General Acc. Assur. Co.*, 410 F.Supp.2d 875, 890 (N.D. Cal. 2006) (observing that in "adopt[in]g the only reasonable construction of the contract," "[t]he fact that some redundancy results is not fatal").

The authorities the Court has seen often blur the very distinction between "loss" and "damage" that Plan Check argues is so critical. In the insurance context, "loss" and "default" are the default, catch-all terms for referring to what the insured is protected against. *See* Black's Law Dictionary (11th ed. 2019) (defining "insurance" as "[a] contract by which one party (the insurer) unertakes to indemnify another party (the insured) against risk of loss, damage, or liability arising from the occurrence of some specified contingency"). One treatise notes that in modern all-risk property insurance policies (such as the Policy), the trigger language is often "physical loss or damage," though it also "may be any of several variants focusing on 'injury,' 'damage,' and the

5

like." Couch on Insurance, § 148:46 (emphasis added). Just three paragraphs later, the treatise goes on to observe – speaking about what is covered by these policies – that "[t]he requirement that the *loss* be 'physical' . . . is widely held to exclude alleged losses that are intangible or incorporeal." Couch on Insurance, § 148:46 (emphasis added). Though the language uses the word "loss," it is clear that the treatise is referring to all property insurance policies. No matter whether the trigger language is "physical loss or damage" or simply "injury," "loss," "damage," or something else, most courts – at least according to this treatise – hold that the tangible requirement applies. *See Simon Marketing, Inc. v. Gulf Ins. Co.*, 149 Cal.App.4th 616, 623 (2007) ("the reference to 'direct' losses is intended to mean *direct losses to property*, *i.e.*, physical damage to insured property * * * * 'detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property' (10A Couch on Insurance, *supra*, § 148:46, p. 148-81) is not compensable under a contract of property insurance.").

The weight of California law also appears to require some tangible alteration, no matter whether the trigger language uses "loss" or "damage." One California court, dealing with an identical "direct physical loss of or damage to property" trigger, was confronted with a case involving a plaintiff who lost information stored in a computer database.[4] *See Ward Gen. Ins. Serv., Inc. v. Emp'rs Fire Ins. Co.*, 114 Cal.App.4th 548 (2003). In determining that the loss of the database information was not a physical loss of property, the court focused on the fact that the property lost by the plaintiff could not "be said to have a material existence, be formed out of tangible matter, or be perceptible to the sense of touch." *Id.* at 556.

Plan Check's reliance on the difference between prepositions – "of" versus "to" – is tied up with the "loss"/"damage" issue and also goes too far. For example, in arguing for a tangible-alteration requirement, AmGuard cited to a case involving a policy that covered "accidental direct physical *loss to* business personal property." *See* Mot. at 10 (citing *MRI Healthcare Ctr.*, 187 Cal.App.4th 766); *see also* Reply at 8. That court observed that "some external force must have acted upon the insured property to cause a physical change in the condition of the property, *i.e.* it must have been '*damaged*' within the common understanding of that term." *MRI Healthcare Ctr.*, 187 Cal.App.4th at 780 (emphasis added). Plan Check argues that the requirement of a "physical change" is not tied to the use of the word "loss," but rather stems from the preposition "to," and

---

[4] The information was lost due to human error and a bug in the software, not mechanical or electrical failure in the hardware storing the database information.

6

therefore should not be imported into an interpretation of the Policy's "physical loss of or damage to" trigger. But did the mere word "to" do all the work there, or did the fact that "loss" was the sole trigger also contribute? For example, what good would a policy that protected against "direct physical *loss of* business personal property" be if it covered the misplacement of some property (without any physical alternation), but not its physical destruction? Not much, and yet that is the interpretation that Plan Check's reasoning would support.

The Court agrees with Plan Check that sometimes the distinction between prepositions is important, but finds that this case is not one of them. In arguing that "loss of" property should extend to instances where an owner is dispossessed of the property, Plan Check relies heavily on a case involving an insurance policy of personal – as opposed to real – property that used the identical "direct physical loss of or damage to" trigger. *See* Opp. at 12 (citing *Total Intermodal Serv. Inc. v. Travelers Prop. Cas. Co. of Am.*, 17-cv-04908, 2018 WL 3829767 (C.D. Cal. July 11, 2018). When the insured did not receive its cargo because the cargo was accidentally shipped to the wrong port (custom authorities there refused to return it), the insurer argued that the loss was not covered because there was no physical damage to the cargo.[5] The court rejected this argument, finding that "'[physical] loss of' property contemplates that the property is misplaced and unrecoverable, without regard to whether it was damaged." *Total Intermodal*, 2018 WL 3829767 at *3. While the court drew a distinction between "loss of" and "loss to," it was careful to "recognize[] that the same phrase in a different kind of insurance contract could mean something else." *Id.*, n. 4. The Court agrees that it would be a strange cargo insurance policy that covered only physical damage to the cargo, but not the insured's deprivation of it. In that setting, the court's holding that "the phrase '[physical] loss of' includes the permanent dispossession of something" makes sense. *Id.* However, it requires a leap to extend that understanding of a permanent dispossession to the real-property insurance context to "include[] changes in what activities can physically occur in the space that cause loss to the insured." Opp. at 15.

Ultimately, the Court finds that Plan Check's interpretation is not a reasonable one because it would be a sweeping expansion of insurance coverage without any manageable bounds. Plan Check insists that its bounding of "physical loss" to situations where changes in permitted physical activities is workable, but as AmGuard notes, it would mean that potentially any regulation that

---

[5] The cargo was in fact later destroyed, but the destruction did not happen during the applicable time period. *Total Intermodal*, 2018 WL 3829767 at *3.

7

limits a business's operations would trigger coverage. Reply at 7. For example, consider the following scenarios: (1) a city changes its maximum occupancy codes to lower the caps, meaning that a particular restaurant can no longer seat as many customers as it used to;[6] (2) a city amends an ordinance requiring restaurants located in residential zones to cease operations between 1:00 a.m. and 5:30 a.m. to expand the window to 12:00 a.m. to 6:00 a.m.; (3) a city issues a mandatory evacuation order to all of its residents due to nearby wildfires (a consequence of this is that all businesses must suspend operations), but lifts the order three weeks later when the wildfires are extinguished without, fortunately, any destruction of property. Under Plan Check's standard, all of these instances would trigger insurance coverage. While Plan Check may believe that that is an appropriate result, the Court is not persuaded.[7]

The manageability issue is not limited to government action, but with anything that interferes with the permitted physical activities on a property. If a building's elevator system had a software bug that temporarily shut down all the elevators, that would clearly interfere with permitted physical activities. Similarly, a snowstorm would interfere with a restaurant's outdoor dining service. And yet Plan Check's interpretation would cover all of these scenarios. It offers no way, and the Court does not see any way, to limit this coverage. Though parties could in theory contract away coverage, this is not practicable for all-risk policies where everything is covered unless expressly excluded. The list of losses that do not fit within the parties' expectations of what property insurance should cover would be a very, very long one.

## IV. Conclusion

Small businesses are suffering from this unprecedented pandemic and COVID-19 insurance cases are starting to be litigated across the nation. However, Plan Check's theory of relief is a major departure from established California law. Just last month, another court in this district dismissed a suit brought by another Los Angeles restaurateur against its insurer involving the identical "physical loss of or damage to" trigger. *See 10E, LLC v. Travelers Indemnity Co. of Connecticut et al.*, 20-cv-04418 (C.D. Cal. Aug. 28, 2020).[8] Based on the foregoing reasons, the

---

[6] To be concrete, suppose that the restaurant can no longer seat six people to a booth, but is now limited to four people to a booth. The changed maximum occupancy codes therefore do not render any booth or other structure in the restaurant useless.

[7] Because the Court finds that Plan Check has not suffered any physical loss of or damage to its properties and therefore its loss is not covered by the Policy, it does not address AmGuard's additional argument that the Policy's virus exclusion applies.

[8] Faced with similar insurance policies and claims – though dealing with different bodies of state law – courts

Court finds that Plan Check's claims were not covered by the Policy and therefore Plan Check fails to state a claim for a breach of contract or the covenant of good faith and fair dealing. Its derivative claim for unfair business practices therefore also fails. Accordingly, the Court **GRANTS** the motion.

---

have split on whether the insureds' losses during the COVID-19 pandemic are covered. Some have applied a similar "physical alteration" standard as this Court. *See, e.g.*, *Social Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.*, No. 20-cv-03311 (S.D.N.Y. May 14, 2020) (applying New York law); *see also Mama Jo's, Ins. v. Sparta Ins. Co.,* No. 17-cv-23362, 2018 WL 3412974, at * (S.D. Fla. Jun. 11, 2018) (finding that insured had not demonstrated "physical loss of or damage to" its restaurant due to nearby construction dust and debris accumulating on it because the loss was "intangible or incorporeal"). At least one court has ruled in favor of plaintiffs by denying a motion to dismiss. *See Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-cv-03127, 2020 WL 4692385, at *5 (W.D. Mo. Aug. 12, 2020) (applying Missouri law and observing that although "there is case law in support of its position that physical tangible alteration is required to show a 'physical loss,'" deciding that that case law was either factually dissimilar or not binding and therefore declining to apply a physical-alteration requirement on the motion to dismiss).